# Supreme Court of Texas

No. 20-0657

E.D., a minor, by and through her parents,
B.O. and D.D., as next friends,

*Petitioners*,

v.

Texas Health Care, P.L.L.C. and Timothy J. Jones, D.O.,

*Respondents*

On Petition for Review from the
Court of Appeals for the Second District of Texas

**PER CURIAM**

The Texas Medical Liability Act requires health-care-liability claimants to timely serve each defendant physician with an adequate expert report. A report is adequate if it represents "an objective good faith effort" to provide "a fair summary of the expert's opinion" regarding the applicable standard of care, the physician's breach of that standard, and the causal relationship between the breach and the harm alleged. TEX. CIV. PRAC. & REM. CODE § 74.351(*l*), (r)(6). In this medical-malpractice case, the trial court held that a timely served expert report was adequate as to breach and causation in a suit alleging that

negligent perinatal care during labor and delivery caused an infant's brain damage and other serious health conditions. The court of appeals reversed and dismissed the suit against the treating physician, but we hold that the trial court did not abuse its discretion in concluding that the expert report satisfies the "fair summary" standard. Accordingly, we reverse the court of appeals' judgment and remand to the trial court for further proceedings.

After a healthy full-term pregnancy, B.O. was admitted to Texas Health Harris Methodist Hospital Southwest Fort Worth (the Hospital) for induction of labor. At approximately 19:00 hours on February 6, 2014,[1] Dr. Timothy J. Jones, D.O., ordered the administration of several drugs to facilitate cervical ripening and delivery. To assess the baby's stress during uterine contractions, nurses contemporaneously commenced fetal heart-rate monitoring.[2]

The next day, on February 7, 2014, at 20:33, Dr. Jones appeared bedside and performed a sterile vaginal exam. At this point, fetal heart tracing showed the baby's heart rate had been "generally reactive," but occasional periods of no accelerations and diminished variability had occurred.

During the ninety-minute period following Dr. Jones's physical examination of B.O.—from 20:33 to 22:00—fetal heart tracing showed

---

[1] The factual recitation is derived from the expert report. The report uses a 24-hour clock, commonly called "military time," and for consistency, we do the same.

[2] Fetal heart rate is monitored as a means of assessing the baby's oxygenation. *See Morrell v. Finke*, 184 S.W.3d 257, 262 (Tex. App.—Fort Worth 2005, pet. denied).

the baby's heart rate had become "non-reassuring" due to "absent accelerations" and minimal or absent variability.[3]  The labor and delivery nurse, Lan Tran, R.N., charted this change.  At 22:29, Nurse Tran telephoned Dr. Jones and notified him about "the patient's condition and new orders were given."  At 22:50, Nurse Tran began administering oxygen to B.O.  From 22:50 to 23:40, Nurse Tran continued to chart minimal variability of the fetal heart rate.

From 23:40 to 23:48, three "clear deep variable decelerations" occurred.[4]  Despite what was "a further serious negative change in events," Nurse Tran erroneously charted that the fetal heart rate had actually improved to show moderate variability.  From 23:50 to 23:57, three more serious deep decelerations occurred.  Nurse Tran paged Dr. Jones and charted that she had "reviewed" the fetal heart tones "with physician" and "interventions done."  However, she did "not chart[] the serious decelerations that [had] been going on and instead [charted] this as moderate variability."  A minute or two later, Nurse Tran charted further variable and late decelerations.  She did not call Dr. Jones to come bedside and, instead, continued to chart moderate variability.

---

[3] A fetal heart-monitor strip is read at regular intervals to determine whether the baby's heart rate is "reassuring" or "nonreassuring."  *See id.*  "Reassuring patterns correlate well with a good fetal outcome, while nonreassuring patterns do not."  Amir Sweha, M.D. et al., *Interpretation of Electronic Fetal Heart Rate During Labor*, AM. FAM. PHYSICIAN (May 1999), http://aafp.org/afp/1999/0501/p2487.html.  Nonreassuring patterns—including fetal tachycardia, bradycardia, and late decelerations—can indicate fetal acidosis.  *See id.*

[4] Persistent late or variable deceleration patterns are considered nonreassuring.  *See* Sweha, *supra* n.3.

At 00:00 on February 8, the fetal heart rate dropped from a baseline of about 150 beats per minute to below 50 beats per minute, a condition called fetal bradycardia. At 00:04, Nurse Tran initiated additional interventions. At 00:06, she notified the charge nurse of "the very concerning situation," and the charge nurse asked Dr. Jones to come to bedside. He arrived at 00:11.

Either when notified at 00:06 or on his arrival at 00:11, Dr. Jones ordered an emergency (STAT) cesarean section. B.O. was not transferred to the operating room until 00:13. Seven minutes later, at 00:20, baby E.D. was delivered in grave condition and was later diagnosed with hypoxic ischemic encephalopathy,[5] cerebral palsy, and quadriplegia.

On E.D.'s behalf, her parents sued Dr. Jones, Texas Health Care, P.L.L.C., Nurse Tran, the Hospital, and others for negligence in causing or contributing to causing E.D.'s injuries. The plaintiffs timely served expert reports on the defendants, including a report by Dr. James Balducci, an obstetrician/gynecologist. After receiving a thirty-day extension to cure deficiencies in the report, plaintiffs timely served Dr. Balducci's amended report. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(c) (authorizing a limited extension to cure deficiencies).

Texas Health and Dr. Jones (collectively, Dr. Jones) objected to the amended report, asserting it fails to show a demonstrable breach of the standard of care and is "conclusory, speculative, and disconnected from the underlying facts." Dr. Jones filed a motion to dismiss the

---

[5] As defined in the expert report, "[h]ypoxic/ischemic encephalopathy means that the brain has shown signs of being injured by the lack of oxygen."

claims with prejudice and requested his attorney's fees and costs, as authorized by statute. *See id.* § 74.351(b). After a hearing, the trial court denied the motion.

On interlocutory appeal, the court of appeals reversed, dismissed the claims against Dr. Jones with prejudice, and remanded to the trial court to award his reasonable attorney's fees and court costs.[6] ___ S.W.3d ___, 2020 WL 1057332, at *12 (Tex. App.—Fort Worth March 5, 2020). The court held that dismissal was required because Dr. Balducci's amended report is conclusory, speculative and, therefore, "legally insufficient to support the Parents' health care liability claims." *Id.* at *10-11.

A sharply divided en banc court denied the plaintiffs' motion for rehearing. In a dissent to the denial, an original panel member wrote that (1) "the original memorandum opinion, which [she had] joined, was flawed"; (2) Dr. Balducci's report "provide[s] a fair summary of what he purport[s] to be the applicable standard of care, how Dr. Jones failed to meet that standard, and the causal relationship between the failure and the harm alleged"; and (3) under the correct standard of appellate review, the court was not permitted to assess the credibility of the expert's opinion or substitute its judgment for that of the trial court. We agree and hold that the trial court did not abuse its discretion in determining that Dr. Balducci's report reflects a good-faith effort to provide a fair summary. *See Baty v. Futrell*, 543 S.W.3d 689, 693 (Tex. 2018) (describing the applicable standard of review).

---

[6] The parents' claims against the other defendants, including Nurse Tran and the Hospital, are not before us on appeal.

The Texas Medical Liability Act requires health-care-liability claimants to serve each defendant physician or health-care provider with an adequate expert report early in the litigation. TEX. CIV. PRAC. & REM. CODE § 74.351(a). If the claimant fails to clear this substantive hurdle, the trial court must dismiss the suit with prejudice and award reasonable attorney's fees and costs to the affected defendant. *See id.* § 74.351(b). By expeditiously weeding out unmeritorious claims "before litigation gets underway," the threshold requirement of an adequate expert report strikes "a careful balance between eradicating frivolous claims and preserving meritorious ones." *Leland v. Brandal*, 257 S.W.3d 204, 208 (Tex. 2008); *Spectrum Healthcare Res., Inc. v. McDaniel*, 306 S.W.3d 249, 253 (Tex. 2010).

An expert report is adequate if it "represent[s] an objective good faith effort" to provide a "fair summary of the expert's opinions regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." TEX. CIV. PRAC. & REM. CODE § 74.351(*l*), (r)(6). An expert report demonstrates a "good faith effort," and is sufficient under the statute, when it "(1) inform[s] the defendant of the specific conduct called into question and (2) provid[es] a basis for the trial court to conclude the claims have merit." *Baty*, 543 S.W.3d at 693-94. This adequacy inquiry is confined to the four corners of the report, taken as a whole, *id.*, and under an abuse-of-discretion standard, "[c]lose calls must go to the trial court." *Larson v. Downing*, 197 S.W.3d 303, 304 (Tex. 2006).

6

Here, Dr. Balducci's opinions concerning breach and causation are at issue. In articulating the standard of care and breach, an expert report "must set forth specific information about what the defendant should have done differently"; that is, "what care was expected, but not given." *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 226 (Tex. 2018) (internal quotations omitted). A report adequately addresses causation when the expert explains "how and why" breach of the standard caused the injury in question by "explain[ing] the basis of his statements and link[ing] conclusions to specific facts." *Id.* at 224. The report need only make "a good-faith effort to explain, factually, how proximate cause is going to be proven." *Id.* At this preliminary stage of the litigation, whether the expert's explanations are "believable" is not relevant to the analysis of whether the expert's opinion constitutes a *good-faith effort*" to comply with the Act. *Id.* at 226 (emphasis added) (internal quotation omitted).

Dr. Balducci's report, construed as a whole, adequately (1) describes the standard of care as effective communication and close monitoring of the fetal heart rate; (2) identifies Dr. Jones's breach as failure to timely and accurately evaluate the fetal heart-tracing markers, either personally or by making appropriate inquiries of the attending nurse; and (3) explains that the failure to do so resulted in Dr. Jones ordering a STAT delivery too late to avoid injury.

The report notes that when Dr. Jones physically examined B.O. at 20:33 on February 7, the fetal heart rate had "periods of diminished variability and absent accelerations." Dr. Balducci opines that, under these circumstances, "the standard of care required . . . Dr. Jones to watch this tracing particularly closely," including "get[ting] accurate

7

information from Nurse Tran or evaluat[ing] the fetal heart tracing personally."

The report observes that by 22:00, approximately ninety minutes after Dr. Jones's physical examination of B.O., the fetal heart rate had become "clear[ly] non-reassuring" with "minimal/absent variability and absent accelerations." In Dr. Balducci's opinion, by that time, the fetal heart tracings had become "extremely concerning," and if Nurse Tran had "notified Dr. Jones, more likely than not, Dr. Jones would have delivered the baby by approximately 22:30, which would have prevented the asphyxia and acidosis that the baby suffered."

Nurse Tran did "notif[y] Dr. Jones by phone at 22:29 of the patient's condition," and "new orders were given" at that time. Dr. Balducci states that the standard of care required Nurse Tran and Dr. Jones to "communicate accurately about the fetal heart rate" and required Dr. Jones to obtain information about fetal heart-rate variability and absent accelerations from Nurse Tran. After six deep variable decelerations had occurred between 23:40 and 23:57, the report notes that Nurse Tran paged Dr. Jones and charted that she had "reviewed" the fetal heart tones "with physician" and "interventions done." According to the report, Nurse Tran did "not chart[] the serious decelerations that ha[d] been going on and instead [charted] this as moderate variability." Nonetheless, in Dr. Balducci's opinion, Dr. Jones "had an obligation under the standard of care to ask questions [of Nurse Tran] to obtain a full and accurate picture of his patient's status . . . in the hours prior to [the] STAT delivery."

The report states that Dr. Jones had a duty to personally evaluate the fetal heart tracings or, in his interactions with Nurse Tran, make

8

inquiries to elicit the data from which he could accurately evaluate the patient's status. The report gives examples of questions Dr. Jones should have asked Nurse Tran.[7] Even so, the court of appeals was unpersuaded that the exemplar questions would have made any difference because several inquire about decelerations, which the report indicates occurred after the 22:29 phone call between doctor and nurse. 2020 WL 1057332, at *10-11. Focusing only on the pre-22:29 fetal heart-rate tracings, the court explained that the expert report rests Dr. Jones's culpability on the "conclusory and speculative" assumption that Nurse Tran would have provided an accurate interpretation "had Dr. Jones adhered to the standard of communication articulated by Dr. Balducci." *Id.* at *10.

The court's analysis misses the mark. First, the report does not limit the standard of care regarding communications to the 22:29 phone call and instead describes the standard of care applicable to all communications between doctor and nurse "in the hours prior to [the] STAT delivery," which includes those that occurred after Nurse Tran paged Dr. Jones at 23:57. Second, even considering only the pre-22:29 data, the report observes that queries like the exemplars would have

---

[7] The questions noted in the report include:

1. What is the variability of the fetal heart tracings? Has the variability changed?
2. Are there any accelerations or decelerations in the fetal heart tracings?
3. How many decelerations?
4. How frequent are the decelerations?
5. How deep are the decelerations?
6. What is the baseline of the fetal heart rate?

9

allowed Dr. Jones to recognize, based on the "non-reassuring" fetal heart-rate tracing, the need to personally examine the patient. Had he done so, "more likely than not, he should and would have delivered the baby . . . by cesarean section" at a time when permanent injury could have been avoided. Dr. Balducci's report meets the fair-summary standard by setting forth "specific information about what the defendant should have done differently." *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001).

In the expert's opinion:

> Had . . . Dr. Jones complied with the standard of care, [he] should have determined that the variability had changed and was minimal and that there were no accelerations. Based on the fetal heart rate tracing at 22:30, he should have gone to see the patient and, based upon the fetal heart rate tracing, should have decided to do a c-section delivery by 23:50 which would have prevented the asphyxia, acidosis and injury.

The report states that Dr. Jones should have responded differently at 22:30 and sets forth how he should have responded, but it does not isolate his communication failures to that point in time. And although it is true that the report repeatedly attributes fault to Nurse Tran for failing to accurately interpret and chart the fetal heart-rate data, it also articulates the standard of care and breach attributable to Dr. Jones and specifically identifies what he was expected, but failed, to do. "[T]he court's job at this stage is not to weigh the report's credibility; that is, the court's disagreement with the expert's opinion does not render the expert report conclusory." *Abshire*, 563 S.W.3d at 226.

10

Dr. Balducci's report also draws a direct line from the breach to E.D.'s injuries. According to the report, "Nurse Tran, the Hospital, and Dr. Jones share the responsibility for their failed communication[,] and their failures to adhere to their respective standards of care combined to cause this avoidable injury." Per the report, (1) "delivery by 23:50 [] would have prevented the asphyxia, acidosis and injury," and (2) "[d]elivery at any time before 00:10 would have prevented the asphyxia, acidosis, hypoxic ischemic encephalopathy and permanent brain injury" E.D. suffered. The report further explains that the failure to timely and accurately evaluate the fetal heart-rate tracings "allowed the urgent situation to develop into [an emergency] need for delivery," and once a baby begins to experience "complete cord occlusion with bradycardia, the *severity* of the ultimate damage depends on how many minutes it takes for the baby to be delivered."[8] For these reasons, Dr. Balducci observes in his report that every single minute of delay in delivery "caused and contributed to [E.D.'s] ultimate injury."

These portions of the report fairly summarize Dr. Balducci's opinion as to how and why Dr. Jones's alleged failure to secure accurate information regarding E.D.'s heart rate foreseeably led to the delay in recognizing the need to deliver E.D. much earlier than 00:20 on February 8. *See Columbia Valley Healthcare Sys., LP v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017) (explaining that the components of proximate cause are foreseeability and cause-in-fact, but a report need not use these specific words).

---

[8] Emphasis added.

11

In holding otherwise, the court of appeals posited that the report establishes a time frame of fifteen minutes as the standard of care for delivering a baby by emergency cesarean or vacuum extraction after notification of fetal bradycardia. 2020 WL 1057332, at \*12. Based on that view of the report, the court deduced that the report negates causation because Dr. Jones delivered E.D. within fourteen minutes after being first notified of a bradycardic event at 00:06 on February 8. *Id.* For these reasons, the court concluded that Dr. Balducci's report is contradictory and "excludes the possibility that Dr. Jones was responsible for [the] two-minute delay in delivery" that resulted from the failure to transport B.O. to the operating room until Dr. Jones arrived bedside at 00:11. In the court's estimation, this discrepancy makes the report "unreasonable, speculative, and conclusory" in asserting that any delay attributable to Dr. Jones breached the standard of care. *Id.* at \*11-12.

The court of appeals analysis is faulty because it does not consider the report as a whole. *See Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 144 (Tex. 2015). Viewing the report in its entirety, as we must, the report attributes breach to Dr. Jones for his inadequate monitoring of and communications about the fetal heart rate in the hours before the STAT delivery and states that these failures delayed Dr. Jones's decision to deliver E.D, which should have occurred *in a much earlier time frame.*

Because Dr. Balducci's report explains "how and why" Dr. Jones's breach led to the injury, the report adequately articulates his opinions regarding causation. *Abshire*, 563 S.W.3d at 224. In concluding differently, the court of appeals' analysis exceeds the scope of the

12

fair-summary standard by impermissibly weighing the credibility of the expert's opinions. *Id.* at 226; *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 516-17 (Tex. 2017). While an expert's report must not be conclusory, the court's skepticism about the expert's opinion does not render it so. *See Abshire*, 563 S.W.3d at 226. The "fair summary" benchmark is not an evidentiary standard, and at this early stage of the litigation, "we do not require a claimant to present evidence in the report as if it were actually litigating the merits." *Id.* (internal quote marks omitted). Rather, "[t]he ultimate evidentiary value of the opinions proffered"—that is, whether there actually is a breach and causal connection—"is a matter to be determined at summary judgment and beyond." *Id.*

Because Dr. Balducci's expert report demonstrates a good faith effort to comply with the requirements of the Texas Medical Liability Act, the trial court did not abuse its discretion in denying Dr. Jones and Texas Health's motion to dismiss. Accordingly, without hearing oral argument, we reverse the court of appeals' judgment and remand the cause to the trial court for further proceedings. *See* TEX. R. APP. P. 59.1.

**OPINION DELIVERED:** May 6, 2022

13